# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DONNA J. BOWERS, individually
and in a representative capacity,

Case No. 01-71724

Plaintiff,

Hon. Patrick J. Duggan

v.

JEFFERSON PILOT FINANCIAL INSURANCE
COMPANY, a Nebraska corporation and
corporate successor to ALEXANDER HAMILTON
LIFE INSURANCE COMPANY OF AMERICA,
a Michigan Corporation.

Defendant.

FILED 2002 AUG 14 PM 12:14 U.S. DIST. CT. EAST. DIST. MICH.

---

Eugene Driker (P12959)
Dennis M. Barnes (P39401)
BARRIS, SOTT, DENN & DRIKER
211 West Fort Street, 15th Floor
Detroit, Michigan  48226
(313) 965-9725
Co-counsel for Defendant

James F. Jorden
Waldemar J. Pflepsen, Jr. (P28157)
Paul A. Fischer
Denise A. Fee
Suite 400E
1025 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
(202) 965-8100
Co-Counsel for Defendant

Stephen Wasinger (P25963)
Gregory D. Hanley (P51204)
WASINGER KICKHAM and HANLEY
100 Beacon Centre
26862 Woodward Avenue
Royal Oak, Michigan  48067
(248) 414-9900
Counsel for Plaintiff and the Class

Chris T. Hellums
PITTMAN HOOKS DUTTON KIRBY
  & HELLUMS, P.C.
1100 Park Place Tower
Birmingham, Alabama  35203
(205) 322-8880
Counsel for Plaintiff and the Class

---

## DEFENDANT'S MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

33

## STATEMENT OF ISSUE PRESENTED

1.     Should the Court certify a nationwide class based on plaintiff's breach of contract claim where that claim (a) is brought by a putative class representative that has no personal knowledge of the facts on which the claim is based and whose infirmities and distant residence make her participation difficult, at best; (b) cannot be resolved without application of the statutory and common law of 50 jurisdictions; (c) requires introduction of individualized evidence in order to interpret each putative class member's contract; and (d) is subject to individualized defenses as to liability and damages?

          Defendant Answers:          "No"

          Plaintiff Answers:          "Yes"

          The Court Should Answer:          "No"

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................ 1

II.   PROCEDURAL BACKGROUND ........................................... 1

III.  FACTUAL BACKGROUND .............................................. 3

    A.   The Alexander Hamilton Irresistible TMX Policy. ......................... 3

    B.   Hamilton's Independent Agents. ...................................... 6

    C.   Decedent Roger Bowers. ............................................ 7

    D.   Plaintiff Donna Bowers. ............................................. 7

IV.   ARGUMENT ........................................................... 8

    A.   The Calculation of the "Net Premium" on an Annual Or Cumulative
        Basis Is The Only Claim Relevant To Plaintiff's Class Motion. .............. 8

    B.   Plaintiff Has Not And Cannot Satisfy The Requirements Of Rule 23. ........ 10

    C.   The Class Representative Fails The "Adequacy" And "Typicality"
        Requirements Of Rule 23(a) ........................................ 11

        1.   Mrs. Bowers' Claim is Not Typical of Those of the Class.  .......... 12

        2.   Mrs. Bowers is Neither Capable of Nor Committed
            to the Vigorous Prosecution of the Class Claim.  .................. 13

    D.   The Proposed Class Cannot Satisfy Rule 23(b)(3).  ..................... 15

        1.   The Claims of Non-Michigan Policyholders Will be
            Governed by the Law of the Jurisdictions in Which
            the Policies Were Sold. ...................................... 17

        2.   Individualized Issues Predominate in Interpreting Contract
            Language at Issue, Whether or Not Michigan Law Governs
            the Class Claims. .......................................... 20

3.  Whether a Putative Class Member's Claim is Time-Barred
    Depends on the Law of the State Where the Policy was Sold.  . . . . . . . 25

4.  The Class Fails the "Superiority" and "Manageability"
    Tests of Rule 23(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page**

*Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274 (W.D. Mo. 2000) ................. 21, 22

*Airmark, Inc. v. Advanced Sys., Inc.*, 715 F.2d 229 (5th Cir. 1983) ...................... 24

*Amchem Products v. Windsor*, 521 U.S. 591 (1997) ............................ 10, 15, 30

*Armbuster v. K-H Corp.*, No. 97-CV-75792DT,
     2002 WL 1358705, at *13 (E.D. Mich. June 17, 2002) ............................ 26

*Ballan v. Upjohn Co.*, 159 F.R.D. 473 (W.D. Mich. 1994) ........................... 14, 15

*Barnes v. American Tobacco*, 161 F.3d 127 (3rd Cir. 1998) ........................... 28

*Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990) ..................................... 24

*Brooks v. So. Bell Tel. & Telegraph Co.*, 133 F.R.D. 54 (S.D. Fla. 1990) ................. 19

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
     155 F.3d 331 (4th Cir. 1998) ............................................... 29-30

*Buettgen v. Volkswagenwerk, A.G.*, 505 F. Supp. 84 (W.D. Mich. 1980) ................. 25

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) .................. 19, 29, 30

*Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) ........................... 29

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.*,
     95 F.R.D. 168 (D. Del. 1982) ............................................... 19-20

*Continental Cas. Co. v. Diversified Indus., Inc.*,
     884 F. Supp. 937 (E.D. Penn. 1995) .......................................... 17

*Davis v. Comed*, 619 F.2d 588 (6th Cir. 1980) ...................................... 13

*Dinerstein v. Paul Revere Life Ins. Co.*, 173 F.3d 826 (11th Cir. 1999) ................ 26-27

*Durant v. Servicemaster Co.*, 208 F.R.D. 228 (E.D. Mich. 2002) .................. 16-17, 28

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .................................. 11

*Equitable v. Poe,* 143 F.3d 1013 (6th Cir. 1998) ...................................... 17

*Garrish v. UAW,* 149 F. Supp.2d 326 (E.D. Mich. 2001) ......................... 12, 13, 28

*General Tel. Co. v. Falcon,* 457 U.S. 147 (1982) .................................. 10, 12

*Hall v. General Motors Corp.,* 582 N.W.2d 866 (Mich. App. 1998) ..................... 25

H.G. Tucker & Assocs. v. Allied Chucker & Engineering Co.,
    234 Mich.App. 550 (1999) .................................................. 2, 25

*Hover v. Chrysler Corp.,* 530 N.W.2d 96 (Mich. App. 1994) .......................... 25

*In re American Med. Sys., Inc.,* 75 F.3d 1069 (6th Cir. 1996) ............ 10, 11-12, 13, 15, 29

*In re Jackson Nat'l Life Ins. Co. Premium Litig.,*
    183 F.R.D. 217 (W.D. Mich. 1998) .................................... 17, 18-19, 29

*In re Jackson Nat'l Life Ins. Co. Premium Litig.,*
    193 F.R.D. 505 (W.D. Mich. 2000) ............................................ 11

*In re LifeUSA Holding Inc.,* 242 F.3d 136 (3rd Cir. 2001) ........................... 28

*Kilgo v. Bowman Transp., Inc.,* 87 F.R.D. 26 (N.D. Ga. 1980) ........................ 13

*Lang v. Aetna Life Ins. Co.,* 196 F.3d 1102 (10th Cir. 1999) .......................... 26

*Makarov v. Volkswagen of Am., Inc.,* 403 N.W.2d 563 (Mich. App. 1987) ................ 25

*Mann v. GTE Mobilnet of Birmingham, Inc.,* 730 So.2d 150 (Ala. 1999) ............... 20-21

*McMerty v. Burtness,* 72 F.R.D. 450 (D. Minn. 1976) ................................ 20

*Mellon Bank, N.A. v. Aetna Business Credit,*
    619 F.2d 1001 (3rd Cir. 1980) ........................................... 23-24

*Mentis v. Del. Amer. Life Ins. Co.,* C.A. No. 98C-12-023 WTQ
    (Del. Sup. Ct. May 30, 2000) .............................................. 23

*Mixon v. Gray Drug Stores, Inc.,* 81 F.R.D. 413 (N.D. Ohio 1978) ...................... 12

*Newton v. Merrill Lynch,* 259 F.3d 154 (3d Cir. 2001) ............................... 11

*O'Neil v. Appel,* 165 F.R.D. 479 (W.D. Mich. 1996) ................................. 11

*Parkhill v. Minnesota Mut. Life Ins. Co.*, 188 F.R.D. 332
  (D. Minn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 9-10

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Roney v. Federal Ins. Co.*, 674 F.2d 587 (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*Smith v. Melon, Inc.*, 659 P.2d 1264 (Ariz. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 10, 13

*State Farm Mut. Auto Ins. Co. v. Lee*, 678 So.2d 818 (Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . 27

*The Air Transport Assoc. of Amer. v. Lenkin,*
  711 F. Supp. 25 (D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*The Pogoda Group v. Fowlerville Mini Storage, Inc.,*
  2001 WL 622533 (Mich. Ct. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Thompson v. County of Medina*, 29 F.3d 238 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Trautz v. Weisman*, 846 F. Supp. 1160 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wonderland Shopping Center Venture Ltd. P'ship v. CDC Mortgage*
  *Capital, Inc.*, 274 F.3d 1085 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES

Mich. Stat. Ann. § 600.5861 (West 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## FEDERAL RULES

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## SECONDARY AUTHORITIES

CORBIN ON CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

NEWBERG ON CLASS ACTIONS 3d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

RESTATEMENT OF CONFLICTS (SECOND) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

RESTATEMENT OF CONTRACTS (SECOND) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I.     INTRODUCTION

Plaintiff asks this Court to certify a nationwide class of life insurance policyholders of Alexander Hamilton Life Insurance Company of America ("Hamilton") on a claim that their cash values have been undercalculated by Hamilton in breach of their contracts of insurance. In so moving, plaintiff seeks to overcome her shortcomings as an adequate representative of the putative class, particularly due to her total lack of personal knowledge of facts relevant to her claim, and to overcome the predominance and trial manageability problems inherent in proceeding with the proposed nationwide class. Plaintiff argues that the Court can decide this lawsuit, on a class basis, without the presentation of evidence beyond the contract provision at issue, and based solely upon consideration of Michigan law. Such shortcuts are unacceptable as they would deprive the Court, the defendant, and members of the putative class of testimony and other evidence necessary to resolve the contract interpretation question presented, the defenses to plaintiff's claim, and the application of the laws of 49 other jurisdictions upon which the claims of out-of-state putative class members depend. Introduction of the necessary evidence and varying state laws into this proceeding will result in a multitude of individualized issues of law and fact, and present corresponding manageability nightmares, such that the pursuit of this case on a class-wide basis is impossible. Plaintiff's request for class certification must be denied.

## II.     PROCEDURAL BACKGROUND

Plaintiff's decedent, Roger Bowers ("Bowers"), filed a four-count class action complaint on April 4, 2001, against Jefferson Pilot Financial Insurance Company ("Jefferson Pilot"), as corporate successor of Hamilton, alleging fraud, negligent misrepresentation, and breach of contract in connection with Hamilton's Flexible Premium Adjustable Life Insurance policies issued since 1981.

Following Bowers' death on May 26, 2001, the executrix of his estate, Donna Bowers ("plaintiff"), filed a First Amended Class Action Complaint on October 19, 2001 ("Amended Complaint"), realleging those claims. On February 4, 2002, the Court dismissed as time-barred or as moot each of plaintiff's claims under each theory of recovery, with one exception: a breach of contract claim based on the calculation of the Bowers policy's Equity Value. Dismissal Order at 11. The lone claim to survive the Motion to Dismiss is that Hamilton calculated Equity Value based on a 94% net of premiums paid, rather than the 98% she contends was required under the contract. *Id.* at 9.

Based on its application of Michigan law,[1] the Court held that plaintiff's Equity Value breach of contract claim was untimely for premium payments made prior to April 4, 1995 – six years before the original complaint was filed. *Id.* at 11. As for post-April 4, 1995 premium payments, the Court held that, based on Michigan law, Hamilton's "periodic calculations of Plaintiff's equity value can be likened to obligations under installment contracts or claims for monthly pension benefits, with each deficient calculation of the equity value constituting a separate breach of contract actionable for the following six years." *Id., citing H.G. Tucker & Assocs. v. Allied Chucker & Engineering Co.,* 234 Mich.App. 550, 562-63 (1999). Plaintiff now moves to certify a nationwide class as to the sole remaining claim.[2]

---

[1]  Michigan law applies to the Bowers policy because that policy was sold and issued in Michigan to then-Michigan resident Roger Bowers. Amended Complaint, ¶¶ 4, 5. As demonstrated below, the laws of the states in which the policies were sold will govern the claims of class members who purchased their policies outside of Michigan. *See* IV.D.1 *infra.*

[2]  In addition to the claim that the Court determined survived Jefferson Pilot's Motion to Dismiss, plaintiff in her class motion, without seeking leave to amend her complaint, asserts two additional claims for which she seeks certification of a nationwide class: first, Hamilton's assessing an "administrative fee," in a manner and for purposes allegedly contrary to the contract of insurance; and second, Hamilton's alleged failure to credit interest at a rate consistent with its investment experience. *See* Class Mot. at 6-9.

2

Plaintiff's putative class is defined as "all persons in the United States who purchased, maintained or were beneficiaries of Flexible Premium Adjustable Life Insurance Policies issued by Hamilton which were in effect at any time after April 4, 1995." Class Mot. at 30.

## III.   FACTUAL BACKGROUND

### A.   The Alexander Hamilton Irresistible TMX Policy.

Although plaintiff seeks certification of a class of *all* policyholders and beneficiaries of *all* Hamilton "flexible premium" products, the policy language at issue appeared only in the Irresistible TMX policy, the policy form purchased by plaintiff's decedent. *See* Phillips Dep. at 32-33.[3] The alleged improper calculation of the Equity Value is predicated on the following provisions of the Bowers policy (the "Policy"):[4]

**Net Premium**

In Policy years one through ten, the Net Premium is equal to:

1.   94% of premiums received up to the Expense Premium shown on the Policy's Schedule Page, plus
2.   98% of any premiums received in excess of the Expense Premium.

In all Policy Years after the tenth Year, the Net Premium is Equal to 98% of all premium received.

Policy at 10.[5] The "Expense Premium," which determines whether the "Net Premium" will be 94%

---

[3]   Alexander Hamilton's "Provider" policy contained a "similar" net premium feature. Fewer than 400 of those policies remain in Jefferson Pilot's records, which include all in force "Provider" policies and those that lapsed during the past three years. *Id.* at 31-32. The Deposition of Hal Phillips is attached to the Class Motion as Exhibit B.

[4]   The Policy is attached to the Class Motion as Exhibit A.

[5]   The policy form for the Irresistible TMX policy sold in Pennsylvania contains different language, *i.e.*, it does not include the "In policy years one through ten" clause or the "In all Policy Years after the tenth year, the Net Premium is equal to 98% of all premium received" clause in defining "Net

3

or 98% of the premium paid, varies based on the age of the insured, gender, and the face amount of the policy; as a result, the Net Premium amount also varies depending on those factors. Phillips Dep. at 29. Net Premium, once calculated, is credited to the policy's Equity Value:

**Equity Value**

On Each Monthly Anniversary, the Equity Value equals:

1) the Equity Value on the preceding Monthly Anniversary, plus
2) all Net Premiums received since the preceding Monthly Anniversary, less
3) any Partial Surrenders, less
4) the Monthly Deduction Amount[6] for the month following the Monthly Anniversary, plus
5) one month's interest.[7]

Policy at 10.

Plaintiff, who had *no* understanding of the provision at issue until after her husband filed this action, now claims that the contract provides that satisfaction of the "Expense Premium" (*i.e.*, "target" premium) is determined on a *cumulative* basis, that is, premiums paid in the first 10 years are credited to Equity Value at the 94% rate until their total equals the Expense Premium, at which time all future premiums are credited at the 98% rate. Amended Complaint, ¶¶48-49. In contrast

---

Premium." This difference is an example of lack of commonality, requiring interpretation of different contract language. Phillips Dep. at 42-44; *id.*, Ex. 3 (Pennsylvania Policy) at 10. *See* attached Exhibit 1.

[6]  The Monthly Deduction Amount includes a "$5.00 Monthly Administrative Fee." Policy at 11. The Policy defines Monthly Deduction Amount as "the total amount deducted each month for the coverage provided under the Policy and any additional benefit riders;" it does not restrict the use of the $5 Monthly Administrative Fee collected. *Id.* at 6.

[7]  As for the rate of interest credited to Equity Value, the Policy provides for a guaranteed rate of the greater of 5% or a rate tied to U.S. Treasury obligation interest rates. The Policy neither expressly nor impliedly promises interest based upon the performance of the insurer's investments. *See* Interest Rate Endorsement and Excess Interest Rate Endorsement to Policy.

with plaintiff's alleged reading of the Policy, Jefferson Pilot determines *annually* if premiums paid exceed the "Expense Premium," that is, premiums paid in each of the first 10 years are credited to Equity Value at 94% until payments in a given year exceed the target premium. The 98% crediting rate thus applies to premiums exceeding the target premium in any of the first 10 years and to all premiums paid in year 11 and thereafter. In calculating the Net Premium in policy years one through 10, Hamilton determined whether the premiums paid in that policy year exceeded the Expense Premium, which is shown on the Policy Schedule Page. Phillips Dep. at 27-28. For the Bowers Policy, the Expense Premium was $1,642.00. Policy at 3.

Prior to this lawsuit, Jefferson Pilot had not received a single complaint from policyholders, beneficiaries, or state insurance regulators regarding its method of calculating Equity Value. *See* Jefferson Pilot's Request for Production Response ("RFP Resp.") No. 13 (attached as Exhibit 2). Independent sales agents who sold Irresistible TMX policies have submitted sworn statements that the company's method of calculating Equity Value was consistent with their understanding of the policy language, that they are unaware of any contrary interpretation of that language, and that, in some instances, they specifically discussed with their clients the manner in which Hamilton calculated Net Premium. *See generally* Declarations of J. Baker; M. Jacoby; C. Isaac; W. Murray; G. Richardson; D. Vento (attached as Exhibit 3). Notwithstanding this history and the absence of any prior claim or inquiry regarding the company's calculation of Equity Value (including by plaintiff or plaintiff's decedent), plaintiff now alleges a contrary, *post facto* understanding of the operative Policy provision.

Whether a policyholder's Equity Value is adversely affected by the company's method of calculation depends on a variety of factors, including:

5

- **whether and when the 11ᵗʰ policy year is reached.** In year 11 and thereafter, all premiums are credited at the 98% rate, *i.e.*, meeting the Expense Premium is no longer a prerequisite for the higher crediting rate and therefore no longer relevant.[8]

- **whether the aggregate of premiums paid in policy years one through 10 ever exceeded the Expense Premium.** If not, even under plaintiff's alleged interpretation of the contract, 94% is the only crediting rate that would apply.

- **whether any premiums were paid since 1995.** If no premiums have been paid during the putative class period (as, for example, in the case of payment of a single, large up-front premium), the 94% versus 98% crediting rate issue is irrelevant.

- **whether the death benefit was paid or the policy lapsed.** The extent to which the premium crediting rate is relevant to any individual policy depends on its being in force during the putative class period. Moreover, if the policy lapsed, the calculation of Equity Value before the lapse is immaterial as the entire value expired.

Thus, whether and to what extent the Net Premium crediting rate is relevant to any putative class member will vary according to the circumstances of each policy.

### B.    Hamilton's Independent Agents.

In contrast with insurers that employ "captive" or "career" agents, Hamilton's flexible premium products were sold to prospective insureds in individualized sales presentations by independent agents who also sold other financial products for other insurance companies. *See* Baker, ¶¶3, 5, 11; Jacoby, ¶¶4-5, 11; Isaac, ¶¶6-7, 11; Murray, ¶¶4-5, 9; Richardson, ¶¶3, 6, 11; Vento, ¶¶4-6, 13. Hamilton's agents were provided varying education regarding the TMX product, but all understood that satisfaction of the target premium was determined on an annual, not cumulative, basis. Baker, ¶¶7-9; Jacoby, ¶¶7-9; Isaac, ¶¶8-10; Murray, ¶¶6-8; Richardson, ¶¶8-10; Vento, ¶¶8-11.

---

[8]    The Bowers Policy, for example, was issued in 1988, reached its 11ᵗʰ year in 1999, and all premiums paid thereafter were credited to Equity Value at 98%. The class representative's claim thus encompasses only a portion of the putative class period, *i.e.*, 1995 through 1998.

### C.    Decedent Roger Bowers.

After meetings with agent Levaughn Lee, Bowers purchased an Irresistible TMX policy in December 1988. Amended Complaint, ¶1. There is no reliable evidence as to (1) the number or substance of Bowers' discussions with agent Lee, (2) Bowers' selection of the Policy over other available products; or (3) his understanding of the Policy generally or the Equity Value provision specifically. *See* Plaintiff's Deposition at 41 ("Pl's Dep.") (attached as Exhibit 4). Bowers cannot testify to these issues and his widow, plaintiff Donna Bowers, has no substantive knowledge of the circumstances surrounding her husband's purchase of the Policy. *See id.* at 42.

Whatever Bowers' understanding of Equity Value at the time he purchased the Policy in 1988, beginning in December 1989 and every year until his death in 2001, he received annual statements that "indisputably" disclosed "that Defendants were calculating the Policy's equity value at a 94% rate, rather than the 98% rate Plaintiff contends the policy requires." Dismissal Order at 9. Despite this knowledge, four times each year for almost 12 years, Bowers continued to pay premium on the Policy and did so without complaint or inquiry regarding the net percentage of those premiums Hamilton applied to Equity Value. *See* Pl's Dep. at 63; Plaintiff's Interrogatory Response ("Interrog. Resp.") Nos. 12, 13 (attached as Exhibit 5); Jefferson Pilot's RFP Resp. No. 13.

### D.    Plaintiff Donna Bowers.

Following her husband's death, and after collecting the death benefit payable under the Policy, Mrs. Bowers was granted leave to amend the original class action complaint, substituting herself as class representative. Plaintiff neither participated in nor had any interest in the decision to purchase the Policy, telling her husband to "just [] take care of it, I don't want nothing to do with it." Pl's Dep. at 45-46. She only knows that her husband wanted some form of life insurance to

7

cover the cost of their mortgage in the event of his death. *Id.* at 42; 44. Plaintiff's involvement with the Policy and contact with agent Lee was limited to signing the application and transmitting premium payments. *Id.* at 43. Plaintiff never has read the Policy or any Policy-related materials. *Id.* at 54-55; 60. She never discussed Equity Value or any other policy provision with either her husband or agent Lee, nor ever felt the need to. *Id.* at 47-48; 57-58. To this day, plaintiff has no understanding of the calculation of the Policy's Equity Value. *Id.* at 53, 57.[9]

## IV.    ARGUMENT

### A.    The Calculation of the "Net Premium" on an Annual Or Cumulative Basis Is The Only Claim Relevant To Plaintiff's Class Motion.

The only claim to survive the Court's February 4, 2002 Dismissal Order is the breach of contract claim based on the crediting of 94% or 98% of premiums paid. The Court dismissed all remaining claims as time-barred under the applicable Michigan statutes of limitation or as moot. In her motion for class certification, however, plaintiff attempts to inject two additional breach of contract claims on behalf of herself and a nationwide class: an "administrative fee" claim and an "interest crediting" claim. The attempt should be rejected as to both claims, which were (1) either not pled or insufficiently pled in the Amended Complaint; (2) not identified in plaintiff's discovery responses; and (3) could not survive a motion to dismiss. In any event, as will be demonstrated, even if these claims were considered in the context of plaintiff's motion, they would multiply the individualized issues and manageability problems that already preclude class certification as to the calculation of the Equity Value claim.

---

[9] In describing her complaint at deposition, plaintiff made no mention of the "administrative fee" or "interest rate" claims that appear in the Class Motion. *See id.* at 27-29.

The essence of the "administrative fee" claim is that the $5 monthly administrative charge expressly provided for under the contract was not *utilized* to "defray administrative costs" associated with the particular policy under which it was paid. Class Mot. at 8-9. Plaintiff does not contend that the administrative fee is undisclosed or unauthorized. Instead, she argues that the $5 monthly deduction "was part of the revenue stream of the company to cover the expense stream,'" rather than used to cover the cost of administering that policyholder's contract, which, according to plaintiff, constitutes a breach. *Id.* at 8, quoting Phillips Dep. at 91-92. Plaintiff further argues that any part of the $5 monthly fee not used to "administer" the payer's policy should have been credited to that policy's Equity Value. *Id.* Plaintiff admits that the administrative fee claim appears nowhere in the Amended Complaint. Class Mot. at 1 n. 1. Nor is there any reference to the administrative fee in plaintiff's interrogatory responses. *See* Pl's Interrog. Resp. Nos. 7-15.

The second additional claim plaintiff asserts in her class motion is that the rate of interest credited to Equity Value was less than the contract required. Although the Amended Complaint contains passing references to this allegation, *e.g.*, Amended Complaint, ¶36, plaintiff now embellishes those references to claim that "the Policy also obligated Hamilton to consider the performance of its own investment portfolio in declaring the [interest crediting] rate . . . and to establish a rate of interest in excess of the guaranteed 5% rate." Class Mot. at 7. The prior negligible references did not provide Jefferson Pilot with sufficient notice of this "claim." The Court was equally unaware of the interest crediting claim as the Dismissal Order, setting forth the extent of the case surviving the Motion to Dismiss, is silent as to this claim. *See Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1058 (8th Cir. 2002) ("[t]he well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine

9

whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules").

Plaintiff does not allege that Hamilton failed to pay the minimum interest rate but instead relies on documents outside the contract to claim an obligation to credit more than that amount. Class Mot. at 7, *citing* "Actuarial Memorandum" and "Buyers Manual." Not only are these materials outside the contract, there is no evidence or allegation that they were relied upon or even seen by plaintiff's decedent. As will be addressed below, certification of a class of such "claims" is improper. *See Parkhill*, 286 F.3d at 1057-58 (allegation that insurer's interest crediting method failed to comply with policy brochure was insufficient because plaintiff "has not alleged that he ever received any sales literature concerning [interest crediting] or that ... any [sales] agent discussed [interest crediting] when [plaintiff] purchased or upgraded the policy").

### B.    Plaintiff Has Not And Cannot Satisfy The Requirements Of Rule 23.

The class action device is an "exception to the general rule that litigation is conducted by and on behalf of the individual named parties only." *General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982). The exception applies only after a "'rigorous analysis' of the requirements of Rule 23." *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998), *quoting Falcon*, 457 U.S. at 161. "No class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified, and each class meeting those prerequisites must also pass at least one of the tests set forth in Rule 23(b)." *Id.*, *citing In re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). It is plaintiff's burden to show that each prerequisite of Rule 23 is satisfied. *Amchem Products v. Windsor*, 521 U.S. 591, 611-14 (1997).

10

The "rigorous analysis" under Rule 23 "ordinarily requires probing beyond the pleadings to achieve an understanding of the precise nature of the claims and enable a pragmatic assessment of the appropriateness of class action treatment." *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 193 F.R.D. 505, 510 (W.D. Mich. 2000) ("*Jackson National II*). Preliminary inquiry into the merits may be appropriate to evaluate how a case would be tried, and therefore whether a class action would satisfy the predominance and manageability requirements of Rule 23. *See Newton v. Merrill Lynch*, 259 F.3d 154, 166-169 (3d Cir. 2001). In the instant case, inquiring into the oral and written communications to which the putative class members were a party, and the course of conduct between these persons and Hamilton, in order to interpret the policy clause at issue readily reveals the predominance of individual issues and the unmanageability of a class-wide trial.[10]

Examination of the instant putative class claim reveals that it does not satisfy the requirements of Rule 23(a) *or* 23(b), and the motion should therefore be denied.

**C.    The Class Representative Fails The "Adequacy" And "Typicality" Requirements Of Rule 23(a).**

To adequately represent the interests of the class, the named plaintiff must (1) share common interests and claims with the unnamed class members, and (2) be capable of and committed to

---

[10]  Plaintiff misstates the rule in asserting that "the Court may not inquire into the merits of the case." Class Mot. at 11, *citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). *O'Neil v. Appel*, 165 F.R.D. 479, 496 (W.D. Mich. 1996) (the "*Eisen* language should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether plaintiffs have met their burden of establishing each of the Rule 23 class action requirements" (quotation omitted); *see also Thompson v. County of Medina*, 29 F.3d 238, 240-41 (6th Cir. 1994) (*Eisen* does not truncate Rule 23 inquiry).

11

vigorous prosecution of the interests of the class through qualified counsel. *Am. Med. Sys.,* 75 F.3d at 1083; *see also Garrish v. UAW,* 149 F. Supp.2d 326, 332 (E.D. Mich. 2001). Donna Bowers satisfies neither element.

### 1.    Mrs. Bowers' Claim is Not Typical of Those of the Class.

Given her husband's death and the payment of the Policy's death benefit to her, plaintiff's only continuing interest in this matter is a limited damages claim for a limited period of time. This fact puts plaintiff is a far different situation than those of the vast majority of the class she seeks to represent.

"The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members." *Am. Med. Sys.,* 75 F.3d at 1083.[11] Where, as here, the named plaintiff's claim is not typical of those of the class, she is likely to prioritize pursuit of issues relevant to her individual claim over those issues relevant to the claims of the putative class. *See Mixon v. Gray Drug Stores, Inc.,* 81 F.R.D. 413, 414 (N.D. Ohio 1978) (estate not an adequate representative because its interest was solely in recovering damages for alleged past discrimination and not in

---

[11]    *See also General Tel. Co. v. Falcon,* noting the overlap of the adequacy, typicality and commonality requirements of Rule 23(a):

> The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

457 U.S. at 158 n. 4.

seeking prospective relief to prevent future harm).[12]

Perhaps in recognition that her interest is not typical of those of the class, plaintiff declares that "Hamilton cannot seriously argue that [she] has any interest that is not aligned with those of the class." Class Mot. at 16. Jefferson Pilot argues exactly that: Mrs. Bowers' claim is not typical of the class because (1) her claim encompasses only half the class period, *i.e.,* premiums paid on the Bowers policy after 1998 were credited at the higher rate; and (2) her decedent's policy is no longer in force and the death benefit has been paid, *i.e.,* she has little if any interest in "fairly and adequately protect[ing] the interests of the' putative class" members whose policies remain in force and who continue to pay premium. *Garrish v. UAW,* 149 F.Supp.2d at 332, *quoting* Fed.R.Civ.P. 23(a)(4). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.,* 133 F.3d at 399. If, for example, Mrs. Bowers places a higher priority on her claim for past money damages at the expense of premium-paying class members, so would go the prospective claims of the class.

### 2.    Mrs. Bowers is Neither Capable of Nor Committed to the Vigorous Prosecution of the Class Claim.

First and foremost, the class representative must have a basic understanding of her claims. *See Am. Med. Sys.,* 75 F.3d at 1083. "[I]ndications that the named plaintiff [i]s not the driving force behind the litigation," as well as "plaintiff's unfamiliarity with the litigation" indicate that plaintiff is not an adequate class representative. *Davis v. Comed,* 619 F.2d 588, 593-94 (6th Cir. 1980). *See*

---

[12]    Federal district courts outside the Sixth Circuit are in accord. *See, e.g., Kilgo v. Bowman Transp., Inc.,* 87 F.R.D. 26, 28-29 (N.D. Ga. 1980) (representative of plaintiff's estate "is not an adequate representative of the proposed class because, although he has an interest in claims for back pay, he does not have the same interest in declaratory and injunctive relief as other members of the proposed class"); *Trautz v. Weisman,* 846 F. Supp. 1160, 1162 (S.D.N.Y. 1994) (estate not an adequate class representative where plaintiff's death mooted his claim for injunctive relief).

*also Ballan v. Upjohn Co.*, 159 F.R.D. 473, 486 (W.D. Mich. 1994) ("the participation of named plaintiffs must not be so minimal that they virtually have abdicated to their attorneys the conduct of the case").

As counsel for plaintiff implicitly acknowledges, Mrs. Bowers is hardly the ideal class representative. *See* Class Mot. at 16-18. The originally named plaintiff was her decedent, Roger Bowers, who interacted with agent Lee, applied for and purchased the Policy, and received the annual Policy statements from Hamilton – statements the Court ruled were "undisputed" in showing that "the insured had notice as early as 1990 that Defendants were calculating the Policy's equity value at a 94% rate, rather than the 98% rate plaintiff contends the policy requires." Dismissal Order at 9. Because Mrs. Bowers had no involvement whatsoever with the Policy (other than as the beneficiary to whom the death benefit was paid), she lacks the capacity to adequately prosecute even her decedent's claim, much less the claims of putative class members. *c.f.* Pl's Dep. at 52-54.

Plaintiff admits to never having read the 1988 contract that she waited until 2001 to charge Hamilton and Jefferson Pilot with breaching. Pl's Dep. at 75. Nor has the putative class representative ever read the policy illustrations, the annual statements, or any other policy-related materials. *Id.* at 54-55, 60. Moreover, plaintiff's deposition testimony confirms both her lack of knowledge of the facts underlying her decedent's claim and that she understands little about the nature of the claim: "Really my full understanding of this isn't what it should be. I should sit down and read it [the Policy]." *Id.* at 57.

Nor has Mrs. Bowers demonstrated the level of commitment and/or interest in the litigation that Rule 23(a)(4) requires. For example, contrary to being "willing and able" to prosecute the class claim (Class Mot. at 18), Mrs. Bowers has been a reluctant witness, requiring several continuances

of her deposition and extensions for providing written discovery responses. *See* Exhibit 6. Moreover, "plaintiff's history of physical ailments ... may affect [her] ability to vigorously participate in the prosecution of a class action." *Am. Med. Sys.*, 75 F.3d at 1083 (Rule 23 requires "explicit finding" that plaintiff is suitable class representative despite "alleged infirmities"). Plaintiff suffers from renal artery failure, ulcerative colitis, hypertension, and heart disease. Pl's Dep. at 7-12. She undergoes renal dialysis three times each week, leaving her feeling "totally zap[ped]" and "very weak" and restricting her ability to travel. *Id.* Her colitis, which is stress related, has the effect to "wrack the body and leave you kind of in rough shape." *Id.* at 9, 12. In addition, plaintiff's Alabama residence is far removed from this Court and makes communication with class counsel "kind of hard." *Id.* at 5. Whether because of her lack of knowledge, poor health, distant residence or other reasons, Mrs. Bowers has been a less than vigorous or committed advocate for the class, "abdicat[ing] to [her] attorneys the conduct of the case." *Ballan v. Upjohn Co.*, 159 F.R.D. at 486.[13]

### D.    The Proposed Class Cannot Satisfy Rule 23(b)(3).

The predominance inquiry is "far more demanding" than Rule 23(a)'s commonality requirement and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem v. Windsor*, 521 U.S. at 594. Looking beyond the allegations of the Amended Complaint reveals that plaintiff cannot satisfy the predominance test of Rule 23(b)(3).

Plaintiff contends that the Court can and should determine if a breach of contract occurred without the benefit of documentary evidence, live testimony or, indeed, even a live policyholder. This antiseptic and evidence-free approach to litigating a nationwide class action of a purely state

---

[13] When asked who or what a class representative is, plaintiff responded (perhaps accurately in this instance) "that would be the lawyers." Pl's Dep. at 80.

law claim ignores the myriad of individualized issues implicated by: (1) the choice of law analysis, which Due Process requires and results in the application of the laws of 49 states and the District of Columbia; (2) interpreting the contract language at issue; and (3) the statutes of limitation and accrual rules of 50 jurisdictions.  Resolution of the class claim cannot occur in a vacuum.  To do so not only circumvents the "rigorous analysis" required before a class may be certified, it deprives Jefferson Pilot its right to put on individual evidence and assert individualized defenses relevant to each class member's claim.

Plaintiff contends that, when the putative class claim is for breach of contract, the motion for certification is largely *pro forma*.  That is not the case, particularly where, as here, more than one interpretation is being offered of the contract language at issue.  *See* IV.D.2 *infra*.  In making this argument, plaintiff principally relies on *Durant v. Servicemaster Co.*, 208 F.R.D. 228 (E.D. Mich. 2002).  The distinguishing facts of that case make it inapposite.

The *Durant* plaintiffs sought class certification of a breach of contract claim based on the defendant's alleged assessment of a surcharge added to its customers' invoices.  *Id.* at 229.  Unlike the instant case, interpretation of the contract was not at issue, nor was any material, potential ambiguity.  *Id.* at 232-33.  There was no need for the court to arrive at the mutual understanding of the parties as to the meaning of a particular clause, and thus no need to consider evidence of understanding.  Instead, the defense against the alleged breach in that case was based on whether a contract had been formed with respect to the surcharge.  *Id.* at 233.  Moreover, unlike the instant case, because all the alleged breaches occurred within a five-month period and the *Durant* complaint was filed less than a year and a half later, there were no statute of limitations, tolling, or claim accrual issues.  *See id.* at 229.  A third distinguishing factor is that, as the surcharge at issue in

*Durant* did not arise until years into the contractual relationship, there was no need for the Court to consider evidence of one-on-one interaction between the defendant's agents and the plaintiffs in purchasing the contract or years of the parties' course of conduct from which to resolve the breach claim. Plaintiff's reliance on *Durant* is misplaced.

### 1. The Claims of Non-Michigan Policyholders Will be Governed by the Law of the Jurisdictions in Which the Policies Were Sold.

Michigan's choice of law rules require the application of the law of the jurisdiction where the policies were purchased. Michigan's choice of law rules look to the expectations of the parties to the contract and the interests of the states involved. *See, e.g., Equitable v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998). In the context of an insurance contract, courts recognize that the insured's residence state has the greatest interest in regulating the sale of insurance in that state. *See, e.g., In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. 217, 223 (W.D. Mich. 1998) ("*Jackson National I*"); *Continental Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937, 951 (E.D. Penn. 1995) (state has "significant interest in prescribing the standards that will govern the insurance contracts purchased within its borders.") Thus, both the expectations of the parties and the relative interests of the states dictate that Michigan law is inapplicable to the claims of non-Michigan plaintiffs. *See* RESTATEMENT OF CONFLICTS (SECOND) § 192, cmt. c. ("There are several reasons why such importance is attributed to the law of the state where the insured was domiciled at the time the policy was applied for. Life insurance is a matter of intense public concern, as evidenced by the fact that it has been subjected to extensive statutory regulation by the great majority of states. Issues arising under a life insurance policy should be determined by the local law of the state which has the dominant interest with respect to these issues, and this will usually be the state where the insured was

17

domiciled at the time the policy was applied for").[14]

Common questions of law and fact will not predominate in a proposed class action where, as here, the choice of law analysis reveals that the law of the forum state may not be applied to the claims of non-resident class members. Plaintiff attempts to avoid this result by arguing, first, that the Court "can properly apply Michigan law to the claims of all class members" (Class Mot. at 25) and, second, if not, "there is no reason to believe that there would be any material difference in state law" (*id.* at 26).[15] Neither argument has merit: (1) Plaintiff is flat wrong in asserting that Michigan law governs insurance sales in the other 49 jurisdictions where the Hamilton policies were sold;[16] and (2) as demonstrated below, there is ample proof that state law differs and that those differences are material.

Judge McKeague rejected this very approach by plaintiffs in an insurance class action in *Jackson National I*, and scolded plaintiffs for making it:

> Rather than contest Jackson National's state law variations argument, plaintiffs attempt to sidestep it. They ask the Court simply to apply Michigan law, the law of the forum state, uniformly to all claims. Plaintiffs have failed to persuade the Court to reconsider its choice-of-law ruling, in which the interests of plaintiffs' states of residence were held to outweigh the interests of the State of Michigan. Indeed, the choice-of-law analysis is a matter of due process and is not to be altered in a nationwide class action simply because it may otherwise result in procedural and management difficulties.

---

[14] *See also* Appendix A (listing states which have enacted statutes requiring the application of that state's law to insurance policies delivered in or insuring lives in that state).

[15] Plaintiff disingenuously relies on *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). The Supreme Court in *Shutts* reviewed a class action filed in Kansas and agreed with the defendant that application of Kansas substantive law to the individual claims of the class (97% of whom had no connection with Kansas) was unconstitutional. 472 U.S. at 816-21.

[16] With the exception of New York, variations of the Irresistible TMX policy form were used throughout the United States. *See* Class Mot. at 4, n.3.

183 F.R.D. at 223. The "significant" state law variations at issue in *Jackson National I* included statute of limitations and the use of parol evidence in resolving a breach of contract claim. *Id.* at 222. As then-Judge Ruth Bader Ginsburg has explained:

> Appellees see the 'which law' matter as academic. They say no variations in state warranty laws relevant to this case exist. A court cannot accept such an assertion 'on faith.' Appellees, as class action proponents, must show that it is accurate . . . *[N]ationwide class action movants must credibly demonstrate, through an 'extensive analysis' of state law variances, that class certification does not present insuperable obstacles.*

*Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016-17 (D.C. Cir. 1986), *cert. denied*, 482 U.S. 915 (1987) (emphasis supplied). Plaintiff has failed completely in meeting her burden.

In contrast with plaintiff's conclusory assertion of no material variations in state law, Jefferson Pilot has provided the Court, in the accompanying Appendices, exhibits reflecting the substantial variances among the state laws relating to a number of issues potentially dispositive of the putative class claims, including: (1) the rules of contract interpretation and construction, and (2) statutes of limitation, including whether an insurance policy is treated as an installment contract for purposes of when a claim for breach accrues. Because variations in state law "will implicate a myriad of individualized issues of law and fact," with plaintiff bearing the "burden of establishing that variations do not 'swamp any common issues,'" the predominance inquiry fails. *Jackson National I*, 183 F.R.D. at 222-23, *quoting Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996).[17]

---

[17] *See also Brooks v. So. Bell Tel. & Telegraph Co.*, 133 F.R.D. 54, 57 (S.D. Fla. 1990) ("factual variances between the different class members, when coupled with at least four different states' laws applicable to contract formation, limitations, modification, waiver and course of dealing issues, create almost infinite legal issues"); *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.*, 95 F.R.D. 168, 177 (D. Del. 1982) (despite identical contracts, bottler "cannot sue on behalf of a class of [unnamed] bottlers whose contracts may well involve the law of thirty-two different

2.  **Individualized Issues Predominate in Interpreting Contract Language at Issue, Whether or Not Michigan Law Governs the Class Claims.**

Although plaintiff contends that class certification is to be presumed in the context of a breach of contract claim, individualized issues of fact and law abound when interpreting contract language. It must be determined if the language is susceptible to more than one meaning and, if so, resolve the ambiguity. Both inquiries depend on the particular contract and the parties to it, as well as the rules of contract interpretation to be applied.

Plaintiff seeks to avoid these individualized inquiries by proclaiming that the "Net Premium" provision is subject to one interpretation: hers. Class Mot. at 6. Plaintiff's contention not only is belied by Jefferson Pilot's (and, before it, Hamilton's) long history of a contrary interpretation – of which Bowers was aware and to which he acquiesced four times each year for more than 12 years – it is internally at odds with plaintiff's insistence that the merits of the class claim are not to be determined in connection with the instant motion. *See* Class Mot. at 11.[18] While Jefferson Pilot is equally committed to its interpretation of the relevant provision, it acknowledges that plaintiff in this lawsuit (or her counsel) allegedly has come to a different (albeit unreasonable) interpretation. Jefferson Pilot does not concede that plaintiff's interpretation is correct. Nor, as plaintiff herself admits, may the Court conclude as much. For purposes of this motion, therefore, the contract

---

states"); *McMerty v. Burtness*, 72 F.R.D. 450, 456 (D. Minn. 1976) (breach of contract claim "presents issues of law which will vary from class member to class member, depending on which state's common law of contracts governs").

[18]  Plaintiff's alleged interpretation also is contrary to the understanding of Hamilton's independent agents, as noted in the agent declarations filed in support hereof. *See* III.B *supra*.

language at issue must be viewed as ambiguous. *See, e.g., Mann v. GTE Mobilnet of Birmingham, Inc.,* 730 So.2d 150, 153 (Ala. 1999) (in deciding class motion, court may not accept plaintiff's characterization of contract; at best (for plaintiff), contract is ambiguous).

Given the parties' conflicting interpretations of the Policy's definition of Net Premium, "plaintiff's claim and those of the proposed class members could probably only be resolved by considering varying types of extrinsic evidence. By allowing extrinsic evidence of the parties' dealings, the breach of contract claims become individualized and not reasonably susceptible to class action treatment." *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274, 282 (W.D. Mo. 2000). As here, the plaintiff in *Adams* was an insured seeking class certification of a breach of contract claim based on uniform policy language. As here, the *Adams* plaintiff urged the court to construe the provision as she did; alternatively, she argued that, if the policy was deemed ambiguous, the doctrine of *contra proferentem* required the language to be construed against the insurer. *Id.* at 280. The court rejected plaintiff's "heads, I win - tails, you lose" argument, holding that a motion for class certification "is not the occasion to make a final ruling as to the merits." *Id.* at 280. Because "the language on which plaintiff relies contains some degree of ambiguity plaintiff would have [the court] adopt a conclusion that not only should a class be certified, but that she is likely to prevail as a matter of law, without a trial establishing the circumstances of the 1986 sale of a policy. This is improbable." *Id.* at 280-81.

That outcome is equally improbable here because Michigan, like Missouri, recognizes the rule of construction favoring the insured *only* in the absence of other means for determining the intent of the parties. *Id.* at 281. Interpreting Michigan law, the Sixth Circuit explained:

Where a course of conduct removes an ambiguity in the written terms of an

agreement, the rule of practical construction should take precedence over the rule that a contract of insurance is construed against its drafter. Once an ambiguity is removed by the parties' conduct, there is no longer a need to apply a rule of construction. Were we to make the rule of strict construction against the drafter paramount to the rule of practical construction, we would be imposing a per se penalty upon the drafter of ambiguous written terms, regardless of whether the ambiguity has been resolved by a mutually agreed upon subsequent course of conduct.

*Roney v. Federal Ins. Co.,* 674 F.2d 587, 590 (6th Cir. 1982). The "mutually agreed upon subsequent course of conduct" evident in the case of the Bowers Policy – *i.e.*, 12 years of premium payments without complaint and with knowledge "that Defendants were calculating the Policy's equity value at a 94% rate, rather than the 98% rate Plaintiff contends the policy requires" (Dismissal Order at 9) – resolves any ambiguity as to the definition of "Net Premium."

More recently, the Sixth Circuit recognized that "Michigan permits the use of extrinsic evidence to dispose of a potential ambiguity, to prove the existence of a potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists." *Wonderland Shopping Center Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.,* 274 F.3d 1085, 1095 (6th Cir. 2001). Thus, even accepting plaintiff's assertions that Michigan law applies to all putative class members, Michigan permits extrinsic evidence to prove an ambiguity and to resolve it.[19] As the Missouri federal court concluded, "once extrinsic evidence is allowed, the breach of contract claims become individualized and not reasonably susceptible to class action treatment." *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. at 282.

---

[19] The extrinsic evidence properly to be considered by the Court would include, among other things, oral communications between the policy purchaser and her insurance agent or others at the time of sale, documentation passed between the purchaser and her agent, communications between the policyholder and the insurance company, and the course of conduct subsequent to purchase. At least two of the independent agents who submitted declarations in support hereof testified that they had detailed discussions with at least some of their clients regarding the operation of the 94%/98% Equity Value calculation. *See* Isaac, ¶14; Murray, ¶12.

Plaintiff's interest crediting claim as a basis for class certification compounds the individualized issues presented and the need for individual evidence. As the interest crediting claim relies upon reference to parol evidence (*see* IV.A *supra*), to fully adjudicate the claim the Court not only will need to consider the two discrete documents referenced by plaintiff but all other oral and written evidence of interest crediting expectations applicable to each putative class member. *See Parkhill v. Minnesota Mut. Life Ins. Co.*, 188 F.R.D. 332, 342-43 (D. Minn. 1999) ("if certification were granted the court would have to conduct thousands of individual inquiries into the content of each sales presentation, the expectations and questions asked by each policyholder, and the reliance placed by each policyholder on the representations made by defendant's agents"). "Representations made by the insurer's sales agents are relevant when construing the true terms of the policy," particularly where, as here, there is no allegation, let alone record evidence, of uniform training of agents to mislead purchasers regarding Equity Value calculations. *Mentis v. Del. Amer. Life Ins. Co.*, C.A. No. 98C-12-023 WTQ, at 10 (Del. Sup. Ct. May 30, 2000) (attached as Exhibit 7). Such a case demands an individualized inquiry into the representations made by particular sales agents.

Michigan is hardly alone in allowing extrinsic evidence both to resolve a contract ambiguity and to prove one. Indeed, "a steadily increasing number of courts have disavowed the plain meaning rule and have recognized the necessity of viewing extrinsic evidence to determine the meaning of the contract terms, or at least to determine whether ambiguity exists." CORBIN ON CONTRACTS, §24.7 at 34.[20] *See, e.g., Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1010 (3rd Cir.

---

[20]   The "plain meaning rule" holds that "if a 'clear, unambiguous' meaning is discernible in the language of the contract, no extrinsic evidence of surrounding circumstances may be admitted to challenge this interpretation. The decision as to whether ambiguity exists must be made without reference to any source other than the contract itself." CORBIN ON CONTRACTS, §24.7 at 33.

23

1980) (applying Pennsylvania law) ("[e]xternal indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms"); *Airmark, Inc. v. Advanced Sys., Inc.*, 715 F.2d 229, 230 (5th Cir. 1983) (applying Texas law) (a court may examine extrinsic evidence to decide if contract is ambiguous). *See also* Appendix B (survey of variation in state laws on admissibility of extrinsic evidence).

Still other states follow the RESTATEMENT OF CONTRACTS, which provides that "[w]ords and other conduct are interpreted in the light of all the circumstances," even where a contract is *not* ambiguous. RESTATEMENT OF CONTRACTS (SECOND), §202(1). Comment "a" to §202(1) explains that these rules "do not depend upon any determination that there is an ambiguity, but are used in determining what meanings are reasonably possible, as well as in choosing among possible meanings." *Id.* A number of states follow the RESTATEMENT'S approach, allowing extrinsic evidence to interpret a contract even where no ambiguity exists. *See, e.g., Berg v. Hudesman*, 801 P.2d 222, 230 (Wash. 1990) ("reject[ing] the theory that ambiguity in the meaning of contract language must exist before evidence of the surrounding circumstances is admissible[, and c]ases to the contrary are overruled"); *Smith v. Melon, Inc.*, 659 P.2d 1264, 1266 (Ariz. 1983) ("[w]hen interpreting an agreement, the court may always consider surrounding circumstances"). *See also* Appendix B. Thus, even assuming plaintiff's assertion that the "Net Premium" definition is unambiguous, in these states the rules of contract interpretation will nevertheless examine the surrounding circumstances of each contract, an examination which necessarily defeats the predominance requirement of Rule 23(b)(3).[21]

---

[21] Contract interpretation will raise individualized inquiries not only due to the variation of state law, but also because the "Net Premium" definition to be interpreted is not uniform throughout the country. *See* Pennsylvania Policy form variations. III.A, n. 3 *supra*; *see also* Exhibit 1. Thus, the

24

Case 2:01-cv-71724-PJD ECF No. 33, PageID.84 Filed 08/14/02 Page 33 of 40

3.     Whether a Putative Class Member's Claim is Time-Barred Depends on the Law of the State Where the Policy was Sold.

Plaintiff's breach of contract claim for post-April 4, 1995, premium payments survived dismissal based on the application of the *Michigan* statute of limitations and the Court's construction of *Michigan* case law in the context of making of "periodic payments" on an insurance contract. *See* Dismissal Order at 10-11, *citing H.G. Tucker & Assocs. v. Allied Chucker & Engineering Co.*, 234 Mich.App. 550 (1999). A wholly different result obtains when the laws of other states – either statutory or common – are applied.

Michigan's "borrowing statute" dictates that claims of non-residents are untimely if barred by the Michigan statute of limitations *or* the limitations period of the plaintiff's state of residence. Mich. Stat. Ann. § 600.5861 (West 2001). "Stated another way, if the statute of limitations of either state bars plaintiff's claim, the action should be dismissed." *Makarov v. Volkswagen of Am., Inc.*, 403 N.W.2d 563, 565 (Mich. App. 1987).[22] As the attached exhibit demonstrates, the limitations period for a breach of contract claim ranges from as few as three years to as many as 15, depending on which state's statute applies. *See* Appendix C. The borrowing statute, however, "borrows" more than the applicable limitations period; Michigan courts also apply the foreign state's statutory and common law on tolling and accrual. *See Makarov*, 403 N.W.2d at 567; *see also Hover v. Chrysler Corp.*, 530 N.W.2d 96, 98 (Mich. App. 1994); *Buettgen v. Volkswagenwerk, A.G.*, 505 F. Supp. 84, 86 (W.D. Mich. 1980).

---

Court will need to conduct further individual inquiry to assess the significance in the difference in language to the mutual understanding of the company and its policyholders.

[22] The borrowing statute is intended "to discourage suits in Michigan that would be time-barred in other states." *Hall v. General Motors Corp.*, 582 N.W.2d 866, 871 (Mich. App. 1998).

25

Whether the claims of non-Michigan class members are time-barred thus depends on more than the length of the applicable limitations period. The survival of plaintiff's breach of contract claim is the combined result of the Michigan statute of limitations *and* the Court's extrapolation of Michigan common law, which the Court concluded allows for insurance contracts to be "likened to" installment contracts for purposes of accrual, "with each deficient calculation of the equity value constituting a separate breach of contract actionable for the following six years." Dismissal Order at 11.[23] Because Michigan's borrowing statute also applies the foreign state's tolling and accrual rules, certification of this proposed class will require the examination of the laws of 49 other jurisdictions to determine if the law of each state "likens" insurance policies to installment contracts such that a separate cause of action accrues with each premium payment.[24]

As the attached Appendix D demonstrates, case law outside of Michigan suggests that a cause of action for breach of an insurance contract accrues from the date the insured was on notice of the alleged breach – irrespective of whether the insured continues to make premium payments after that date. The Eleventh Circuit, for example, interpreted Florida law to find that disability payments due under an insurance policy are "not . . . a debt payable by installments; it is rather a

---

[23] Jefferson Pilot argued that the entirety of the Equity Value claim is time-barred because, as the Court held, "the insured had notice as early as 1990 that Defendants were calculating the Policy's equity value at a 94% rate, rather than the 98% Plaintiff contends the Policy requires." *Id.* at 9. Given that the Court's ruling on this issue at the motion to dismiss stage was without benefit of the issue's further development through discovery and class briefing, Jefferson Pilot respectfully would urge the Court to reconsider its decision that a life insurance policy may be governed by a principle applicable to installment contracts.

[24] In an ERISA context, this Court more recently held that to accept the characterization of a "denial of benefits claim as an 'installment contract' would give [that] claim 'an indefinite lifespan' and run contrary to the policies underlying statutes of limitations." *Armbuster v. K-H Corp.,* No. 97-CV-75792DT, 2002 WL 1358705, at *13 (E.D. Mich. June 17, 2002), *quoting Lang v. Aetna Life Ins. Co.,* 196 F.3d 1102, 1105 (10th Cir. 1999).

cause of action seeking to define the rights and obligations of the parties under the original insurance contract. The Florida Supreme Court has directly addressed this issue and held that a breach of contract action on an insurance contract accrues on the date the contract is breached." *Dinerstein v. Paul Revere Life Ins. Co.,* 173 F.3d 826, 827-28 (11th Cir. 1999), *citing State Farm Mut. Auto Ins. Co. v. Lee,* 678 So.2d 818, 821 (Fla. 1996) ("the issue is not whether the total amount due under a particular installment was fully paid, but rather whether it was owed in the first place").

The view that periodic payments form the basis for a series of separate breaches with separate accrual dates – as opposed to a single breach with continuing effects – also has been rejected in non-insurance contexts, including leases, payment of management fees, mortgage escrow payments, pension benefits, and disability benefits. The policies of contract interpretation favor resolving disputes

> earlier in the life of a contract rather than later. Parties to longstanding agreements will often make future business plans and arrangements on the basis of contract interpretations that have not been questioned but which according to plaintiff's theory could be questioned at any time during – and even after – the life of a contract.

*The Air Transport Assoc. of Amer. v. Lenkin,* 711 F. Supp. 25, 27 (D.D.C. 1989), *aff'd on other grounds,* 899 F.2d 1265 (D.C. Cir. 1990). Assuming *arguendo* that the law in Michigan is to treat insurance policies as divisible contracts that give rise to separate and continuing claims of breach, it cannot be assumed that is the law elsewhere.

### 4. The Class Fails the "Superiority" and "Manageability" Tests of Rule 23(b)(3).

Plaintiff's proposed class is neither "superior" nor "manageable" because (a) the class definition is imprecise, making it difficult – if not impossible – to determine who is in the class; and (b) the necessity of numerous "mini-trials" to resolve individual claims.

27

"The class definition must be sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member of the proposed class." *Durant v. Servicemaster Co.*, 208 F.R.D. at 231, *quoting Garrish v. UAW,* 149 F. Supp.2d at 330-31. A class of "all" purchasers or beneficiaries of Hamilton flexible premium products in effect after April 4, 1995, as plaintiff proposes, is fatally imprecise. As set forth above, whether a policyholder's Equity Value is (or was) adversely affected by the companies' calculation of Net Premium depends entirely on a number of factors, including when (or whether) the policy reached its 11th year; whether the aggregate of premiums paid in years one through 10 ever exceeded the target premium; whether any premiums were paid since 1995; and whether the policy was in force during the entire class period. Thus, an examination of the premium payment history of each policy would be necessary to "determine who would be entitled to relief, who would be bound by a judgment, and who is entitled to notice of the action." *Garrish* at 331. Given the number of variables at issue, these individuals are not, as plaintiff contends, readily ascertainable.

Moreover, the claims of each proposed class member are subject to individualized affirmative defenses, such as statute of limitations or waiver, which may preclude liability or damages. *In re LifeUSA Holding Inc.,* 242 F.3d 136, 145 (3rd Cir. 2001). Determining the availability of affirmative defenses requires plaintiff-specific factual examinations, which Jefferson Pilot is entitled to undertake as to each putative class member. *See, e.g., Barnes v. American Tobacco,* 161 F.3d 127, 149 (3rd Cir. 1998) ("determining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification").[25]

[25]  Statute of limitations is not the only affirmative defense available to Jefferson Pilot that implicates individualized inquiries. For example, the doctrine of waiver, applicable to plaintiff's claim, precludes a breach of contract claim where a party's "continue[d] performance despite the

The named plaintiffs and putative class members' individual and factually unique circumstances, as well as the defenses and state law applicable to each, demonstrate that class adjudication is neither superior nor manageable. As the Sixth Circuit observed, "[t]he law ... may differ among the states only in nuance, but nuance can be important. ... If more than a few of the laws of the fifty states differ, the district judge would face the impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate action." *Am. Med. Sys.*, 75 F.3d at 1085-86 (citations and quotations omitted). "[W]hen a court determines that a multitude of mini-trials will be necessary to dispose of individual claims, the court will likely find that common questions do not predominate, and the need for numerous mini-trials renders the class action unmanageable and not superior." NEWBERG ON CLASS ACTIONS 3d § 4.32 at 4-134. *See also Jackson National I*, 183 F.R.D. at 223; *Castano*, 84 F.3d at 745 n.19.

While plaintiff glosses over the constitutional issues implicated by a proposed nationwide class of a purely state law claim, the Court may not. The requirements of Rule 23 may not be satisfied at the expense of Jefferson Pilot's right to put on individualized evidence, raise individualized defenses, and receive a verdict on the individualized facts of each class member's claim. *See, e.g., Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 312 (5th Cir. 1998) ("Rule 23(b)(3) . . . does not alter the requirement elements which must be found to impose liability and fix damages"); *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331, 345 (4th Cir. 1998)

---

breach," evidences a voluntary relinquishment of a known right. *The Pogoda Group v. Fowlerville Mini Storage, Inc.*, 2001 WL 622533, at *3 (Mich. Ct. App. 2001). Of course, the waiver defense also is subject to variations in state common law.

(defendant entitled to individually defend against individual class members' individual claims).[26]

To proceed otherwise, in the interest of achieving class action manageability, not only is a denial of Due Process, it violates Jefferson Pilot's Seventh Amendment right to have one jury make findings of fact and apply them to the applicable law. *See Castano*, 84 F.3d at 750. As the Supreme Court observed, "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedures shall not abridge, enlarge, or modify any substantive right." *Amchem*, 521 U.S. at 613, 612 (quotations and citations omitted).

## CONCLUSION

For the reasons set forth above, Jefferson Pilot respectfully requests that the Court deny plaintiff's Motion for Class Certification.

Respectfully submitted,

BARRIS, SOTT, DENN & DRIKER, PLLC          JORDEN BURT LLP

By: _____              By: _____
Eugene Driker (P12959)                     James F. Jorden
Dennis M. Barnes (P39401)                  Waldemar J. Pflepsen, Jr. (P28157)
Fifteenth Floor                            Paul A. Fischer
211 West Fort Street                       Denise A. Fee
Detroit, Michigan 48226                    Suite 400E
(313) 965-9725                             1025 Thomas Jefferson Street, N.W.
                                           Washington, D.C. 20007
                                           (202) 965-8100

Co-Counsel for Defendant                   Co-Counsel for Defendant

---

[26]   A class action defendant cannot be forced to defend against a fictional or composite, *i.e.*, "perfect," plaintiff. *Id.* Here, plaintiff asserts a putative class claim based on allegations made by her late husband – allegations she cannot articulate or corroborate and which Jefferson Pilot cannot defend based on evidence obtained from the person who made them. The strength of plaintiff's claim cannot improve as a result of her husband's death and her lack of knowledge of his claim.

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Defendant Jefferson Pilot's Opposition to Plaintiff's Motion for Class Certification were sent by first-class mail, postage prepaid, this 14th day of August, 2002, to the following:

>Stephen Wasinger, Esq.
>Gregory D. Hanley, Esq.
>WASINGER KICKHAM AND HANLEY
>100 Beacon Centre
>26862 Woodward Avenue
>Royal Oak, MI   48067
>
>Chris T. Hellums, Esq.
>PITTMAN, HOOKS, DUTTON
>  & HOLLIS, P.C.
>1100 Park Place Tower
>Birmingham, Alabama   35203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED